IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
: 
In re: : Chapter 11
:
SIMPLEXITY, LLC, *et al.*,[1] : Case No. 14-10569 (KG)
:
                Debtors. :
: Joint Administration Requested
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DECLARATION OF FRANK C. BENNETT III IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY RELIEF

I, Frank C. Bennett III, do hereby declare, under penalty of perjury, that:

      1.      I am the Chief Executive Officer of Simplexity, LLC ("Simplexity"), a limited liability corporation duly organized under and existing pursuant to the laws of the State of Delaware, and one of the above captioned chapter 11 debtors and debtors in possession (collectively, the "Debtors" or the "Company").  I have acted as Simplexity's Chief Executive Officer since December, 2012.  Prior to becoming Simplexity's Chief Executive Officer, I served as the Company's Chief Operating Officer, having held that position since 2007.

      2.      In this role, I am responsible for devising and implementing the Debtors' business plans and strategies and overseeing the Debtors' financial, operational and legal affairs. In addition, as Chief Executive Officer I have been actively involved in the Debtors' efforts to develop, negotiate and implement various strategic alternatives for the orderly sale of the Debtors' assets in a manner that maximizes their value.

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Simplexity, LLC (9770); Simplexity Services, LLC (2823) (together with Simplexity, LLC, the "Simplexity Debtors"); and Adeptio INPC Holdings, LLC (4699) ("Adeptio").  The Simplexity Debtors' mailing address is 10790 Parkridge Blvd., Suite 200, Reston, VA 20191.  Adeptio's mailing address is Cira Centre, 2929 Arch Street, Suite 1800, Philadelphia, PA 19104.

3. On March 16, 2014 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"). As discussed below, the Debtors' primary objective in commencing these chapter 11 cases is to pursue an expedited sale of their assets in order to maximize value for all stakeholders.

4. The Debtors intend to operate their business and to manage their property as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code. I am advised by counsel that this Court has jurisdiction over this chapter 11 case pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012 (Sleet, C.J.). Venue of these cases is proper in the United States Bankruptcy Court for the District of Delaware pursuant to 28 U.S.C. §§ 1408 and 1409.

A.  **Overview of the Debtors' Business**

5. Prior to the recent shutdown of their operations (described in greater detail below) the Debtors were the largest independent online activator of mobile phones in the United States through their Consumer Wireless Division ("CWD"), which comprises the Company's branded Wirefly website and hundreds of private label websites that are enabled by the Debtors' infrastructure and seamlessly integrated with online retail partners' sites. The Debtors also offered the most complete and easiest to implement software platform to assist physical, online, and omni-channel retailers through their Retail Transaction Services Division ("RTSD"), enabling faster, more efficient, more accurate, and more profitable processes for the sale and activation of mobile devices. In addition to being the largest independent online activator of

wireless devices for Verizon, T-Mobile, and Sprint, the Debtors powered sales for 15 of the top 20 retail websites that sell mobile phones.

6. The CWD is an online retailer, and generated the majority of the Debtors' revenue through the sale of mobile devices, and carrier commissions earned from the sale of wireless subscription plans. These devices and subscription plans were sold through the Debtors' Wirefly website as well as through online retail partner websites that were powered by the Company's private label offering. While the CWD has significant scale as a retailer and has provided both the environment and funding for the development of the Debtors' unique IT platform, intellectual property and expertise, the Debtors expected their revenue growth to be driven by the RTSD, which provides physical and online retailers with a best-in-class technology platform. By leveraging their existing technology investment and wireless ecosystem relationships, the Debtors were able to offer the largest retailers in the United States a software platform with unique capabilities to solve the challenges associated with selling wireless devices and services.

7. The Debtors' strength was simplifying the extraordinarily complex process of selling and activating mobile devices for physical and online retailers, and offering a single interface for in-store or omni-channel activations across both carriers and devices. The Debtors' flexible, scalable, end-to-end platform provided retailers with fully integrated operations for order and acquisition, credit and activation, fraud and deactivation, forward and reverse logistics, POS integration, commissions management and carrier reconciliation, and secondary customer contracts. The Debtors' simple user interface is capable of streamlining the sale and activations process, and reducing the amount of time required for in-store activation from an average of 45 – 55 minutes to approximately 20 minutes. In addition, the Debtors'

supply chain and inventory management features can free up millions of dollars in inventory within weeks of deployment, significantly reducing capital requirements for retailers.

8.      The Debtors are headquartered in Reston, Virginia, and prior to the recent shutdown of operations, had approximately 219 employees and 285 full time equivalent contractors.  On or prior to March 12, 2014, the Debtors terminated substantially all of their workforce, and as of Petition Date, I am the Debtors' only employee.

**B.    Assets and Primary Debt Structure**

9.      <u>Assets</u>:  The primary assets of the Debtors are intellectual property, domain names, hardware, inventory, furniture, fixtures, equipment, and accounts receivable. Additional assets could include, among other things, real property leases and customer lists. Because of the nature of the Debtors' business it is difficult to accurately value their assets. However, when the Debtors were valued prior to the Petition Date as a fully operational entity, their value was estimated at approximately $150,000,000.

10.     <u>Secured Debt</u>:  Each of the Debtors are obligors (the Simplexity Debtors as borrowers and Adeptio as guarantor) under that certain credit agreement dated as of December 15, 2009 (as amended, restated, supplemented or otherwise modified from time to time, the "<u>Credit Agreement</u>"), among Fifth Third Bank, an Ohio banking corporation, in its capacity as administrative agent (the "<u>Prepetition Agent</u>"), and the lenders party thereto (collectively, the "<u>Pre-Petition Secured Creditor</u>").  The Credit Agreement provided for (i) a revolving loan commitment of up to $15 million (the "<u>Prepetition Revolver</u>"), and (ii) a $30 million term loan (the "<u>Prepetition Term Loan</u>" and, with the Prepetition Revolver, the "<u>First Lien Credit Facility</u>").  The Credit Agreement is purportedly secured by substantially all of the Debtors' assets (the "<u>Prepetition Collateral</u>"), including their: (a) equipment, (b) inventory, (c) chattel

paper, (d) accounts, (e) other pledged property and securities, (f) investment related property, (g) cash collateral accounts, (h) intellectual property and (i) commercial tort claims.

11. In addition to the First Lien Credit Facility, Simplexity and Simplexity Services, as obligors, and Adeptio Funding, LLC, as lender ("Adeptio Funding"), are parties to that certain Amended and Restated Demand Promissory Note, dated May 29, 2013 (as amended, restated, supplemented or otherwise modified from time to time, the "Second Lien Credit Facility"). The obligations under the Second Lien Credit Facility are secured by the Prepetition Collateral. As of the Petition Date, approximately $36,065,000 in principal amount of debt was outstanding under the Second Lien Credit Facility (the "Second Lien Debt"). The intercreditor relationship among the Pre-Petition Secured Creditor and Adeptio Funding, in its capacity as second lien secured lender, is governed by that certain Subordination Agreement, dated April 3, 2013.[2]

12. General Unsecured Debt: The majority of the Debtors' approximately $20.7 million in unsecured debt consists of general trade debt for parties supplying inventory and services to the Debtors prepetition. However, this amount also includes general unsecured debt that the Debtors have incurred in the administration and operation of their business, and obligations related to their real and personal property leaseholds.

13. Ownership Structure: Simplexity was formed by Versa Capital Management ("Versa") in 2007 to acquire the assets of InPhonic, which traces its roots to 1999. Simplexity purchased the InPhonic assets through InPhonic's own chapter 11 bankruptcy cases. *See In re Inphonic, Inc.*, Ch. Case No. 07-11666 (KG), Sale Order entered on Dec. 17, 2007

---

[2] This section summarizes certain key contractual relationships pertaining to the financing of the Debtors' operations; however, the Pre-Petition Secured Creditor, Adeptio and other parties are party to certain additional agreements in connection with the financing of the Debtors' operations that are not described herein.

[Docket No. 250].  Adeptio's membership interests are held by Adeptio INPC Investments, LLC (73%) and Adeptio INPC Investments Paralell, LLC (27%).  Simplexity's membership interests are held entirely by Adeptio.  Simplexity Services' membership interests are held entirely by Simplexity.

**C.    Events Leading to the Debtors' Bankruptcy Filings and the Debtors' Postpetition Strategy**

14.    As a consequence of a rapidly declining cash balance and tightening liquidity, which resulted in several events of default being triggered under the Senior Credit Agreement, in the second quarter of 2013 the Debtors began exploring potential strategic alternatives with a view to maximizing stakeholder recoveries, including, among other alternatives, a sale of a material portion of the Debtors' assets.  In connection with exploring these strategic alternatives, the Debtors and the Pre-Petition Secured Creditor entered into certain forbearance agreements from time to time.  The parties' most recent forbearance agreement, entered into in September 2013, required that the Debtors proceed with a sale process for substantially of their assets.  The Debtors consented to this requirement and actively cooperated with Pre-Petition Secured Creditor's request, working with the Pre-Petition Secured Creditor's advisors and readying their assets for market.

15.    More recently, the Debtors engaged Rutberg & Co. ("Rutberg") as their own investment banker to assist with their sale efforts.  Rutberg's role included negotiations with interested parties, preparing for and initiating marketing efforts as well as facilitating due diligence by various parties.  Within weeks of commencing this process, the Debtors were considering several alternatives – with the most likely scenario culminating in an asset sale that would have maximized creditor recoveries, minimized customer disruption, and potentially preserved numerous jobs.

16. Notwithstanding the prior forbearance agreements and the restructuring initiatives underway, on March 4, 2014, the Pre-Petition Secured Creditor delivered to the Debtors that certain Notice of Termination of Forbearance Period, Reservation of Rights, Additional Request for Information and Spoliation Notice (the "Bank Letter"). The Bank Letter provided, and subsequent conversations between the Debtors and the Pre-Petition Secured Creditor confirmed, that the Pre-Petition Secured Creditor intended to sweep all of the Debtors' cash on deposit and on a go forward basis, and to cease any advance of additional funds.

17. The Debtors immediately engaged in earnest discussions with the Pre-Petition Secured Creditor and its external counsel regarding the Company's precarious liquidity position. The Debtors pointed out that a decision to sweep cash and refuse to advance further funds would result in the Debtors' inability to pay employees and vendors, effectively requiring the Debtors to cease operations. The Debtors requested that the Pre-Petition Secured Creditor advance additional funds pursuant to a budget provided to the Pre-Petition Secured Creditor and permit funding of payroll. Nevertheless, on March 10, 2014, the Pre-Petition Secured Creditor swept all of the Debtors' cash on deposit, which was earmarked for payroll, and refused to make additional advances to the Debtors in order to bridge to an orderly sale process or pay other operating expenses. Given the lack of any additional liquidity and the Pre-Petition Secured Creditor's continued sweeps of the Debtors cash, the Debtors distributed immediately effective termination notices to their employees on the morning of March 12, 2014, and effectively ceased active operations that same day.[3]

18. In the days since "shutting their doors", the Debtors and their advisors have worked around the clock to determine an appropriate course of action for winding down the

---

[3] Myself, and several of the Company's other officers and employees, have agreed to continue to assist the Debtors with their wind down efforts.

Debtors' affairs in a manner that maximizes creditor recoveries.  During this period, the Debtors were contacted by several parties that expressed an interest in moving quickly toward the consummation of an expedited purchase of the Company's assets.  The majority of these parties were the Debtors' retail partners whose ability to sell and activate wireless phones was dependent upon the Company's software platform, and as a consequence of the Company ceasing operations, find themselves in an untenable position.  Upon being made aware of these expressions of interest, the Subordinated Lender offered to provide the Debtors with a limited amount of debtor in possession financing (the "DIP Facility") to support a sale process within the context of a chapter 11 proceeding.  After evaluating various liquidation strategies, the Debtors determined that the most prudent course of action was to obtain the DIP Facility in order conduct an expedited, yet orderly asset sale and wind-down of operations through the present chapter 11 cases.

19. The Company's software platform, related services and employee expertise are the Company's primary assets.  Transferring these assets will require an organized sale process and the continuing services of certain of the Company's employees and third-party vendors.  At this time, the DIP Facility is the Company's best and only means of obtaining the liquidity necessary to pay the employees and vendors necessary to maximize value of the Company's assets.  In addition, using the Company's cash collateral will permit the Company to conduct a sale process to ensure that the highest value is obtained for the assets, which would be better than a rushed sale to the first interested party.  Although we cannot be certain that the price obtained through such a process will be higher than that which may be obtained outside of a chapter 11 case, conducting the process within these chapter 11 cases gives us a means to assess interest from other parties and make sure that appropriate value is received.  Based on the advice

of the Company' investment bankers and other professionals as well as my expertise with respect to the Company's business, I believe that an orderly sale process will produce substantially more realizable value than a mass liquidation.

20. In order to maximize the value of their assets, the Debtors are continuing to work with Rutberg to assist with a sale process that the Debtors must consummate within the next 35 days. Based upon the limited financing provided by the DIP Facility, and the nature of the Debtors' operations, the Debtors in consultation with Rutberg and the Subordinated Lender, determined that an expedited sale process concluding within this timeframe is in the best interests of the Debtors, their estates, and creditors. Should the sale process take any longer, the Debtors may not be able to obtain any meaningful incremental value for their stakeholders. Specifically, the wireless carriers and the Debtors' retail partners rely heavily upon the infrastructure provided by the Debtors' software platform to support, among other things, their sales and activation of wireless phones. However, at some point these entities will find a replacement partner if the Debtors' software platform is not restarted in the immediate future. Once such a replacement is found, the value of the Debtors' assets will be greatly diminished.

**D.    First Day Motions**

21. I have reviewed each of the First Day Pleadings (including the exhibits and schedules attached thereto) listed on <u>Exhibit A</u> and, to the best of my knowledge, believe that the facts set forth therein are true and correct. If I were called upon to testify, I could and would, based on the foregoing, testify competently to the facts set forth in each of the First Day Pleadings.

22. Moreover, as a result of my first-hand experience, and through my review of various materials and information, discussions with other of the Debtors' remaining officers,

and discussions with the Debtors' outside advisors, I have formed opinions as to the necessity of obtaining the relief sought by the Debtors in their First Day Pleadings listed on <u>Exhibit A</u>, and the need for the Debtors to continue to effectuate a smooth transition into chapter 11 in order to wind down their affairs and liquidate their assets.

Accordingly, for the reasons stated herein and in each of the First Day Pleadings filed concurrently or in connection with the commencement of these cases, I respectfully request that each of the First Day Pleadings be granted in its entirety, together with such other and further relief as this Court deems just and proper.

I certify under penalty of perjury that, based upon my knowledge, information and belief as set forth in this Declaration, the foregoing is true and correct.

Executed this 17TH day of March, 2014 at Reston, Virginia

/s/ Frank C. Bennett III
Frank C. Bennett III
Chief Executive Officer

# EXHIBIT A

## First Day Pleadings

1. Debtors' Motion for an Order Authorizing Joint Administration of their Chapter 11 Cases Pursuant to Bankruptcy Rule 1015 and Local Rule 1015-1

2. Debtors' Motion for an Order (i) Approving Cash Management System; (ii) Authorizing Use of Prepetition Bank Accounts and Checks; and (iii) Waiving the Requirements of 11 U.S.C. § 345(b) on an Interim Basis

3. Debtors' Motion for Entry of Interim and Final Orders, Pursuant to Section 105(a) and 366 of the Bankruptcy Code, (i) Prohibiting Utility Companies From Altering, Refusing or Discontinuing Utility Services, (ii) Deeming Utility Companies Adequately Assured of Future Performance and (iii) Establishing Procedures for Determining Adequate Assurance of Payment

4. Emergency Motion of the Debtors, for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e) and Fed. R. Bankr. P. 2002, 4001 and 9014 (i) Authorizing Debtors (a) to Obtain Post-Petition Secured Financing and (b) to Utilize Cash Collateral, (ii) Granting Adequate Protection to Pre-Petition Secured Parties and (iii) Scheduling a Final Hearing