IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                          :
In re:                                    :    Chapter 11
                                          :
SIMPLEXITY, LLC, *et al.*,[1]             :    Case No. 14-10569 (KG)
                                          :
                    Debtors.              :
                                          :    Joint Administration Requested
                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**EMERGENCY MOTION OF THE DEBTORS, FOR ENTRY OF INTERIM AND FINAL
ORDERS PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3),
364(d)(1), AND 364(e) AND FED. R. BANKR. P. 2002, 4001 AND 9014 (I) AUTHORIZING
DEBTORS (A) TO OBTAIN POST-PETITION SECURED FINANCING AND (B) TO
UTILIZE CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION TO
PRE-PETITION SECURED PARTIES AND (III) SCHEDULING A FINAL HEARING**

Simplexity, LLC ("Simplexity"), Simplexity Services, LLC ("Simplexity

Services") and Adeptio INPC Holdings, LLC ("Holdings"), affiliated debtors and debtors in

possession in the above-captioned cases (each a "Debtor," and collectively, the "Debtors"),

respectfully represent:

## SUMMARY OF RELIEF REQUESTED

1.      By this motion (the "Motion"), the Debtors request entry of interim (the

"Interim Order") and final orders, pursuant to sections 105(a), 361, 362, 363, 364 and 507 of title

11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001 and 9014 of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Local Rule 4001-2 of the

Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the

---

[1]  The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are:
Simplexity, LLC (9770); Simplexity Services, LLC (2823) (together with Simplexity, LLC, the "Simplexity
Debtors"); and Adeptio INPC Holdings, LLC (4699) ("Adeptio").  The Simplexity Debtors' mailing address is
10790 Parkridge Blvd., Suite 200, Reston, VA 20191.  Adeptio's mailing address is Cira Centre, 2929 Arch Street,
Suite 1800, Philadelphia, PA 19104.

District of Delaware (the "Local Rules"), (a) (i) authorizing the Debtors to use the "Cash Collateral" (as such term is defined in section 363(a) of the Bankruptcy Code) of the Pre-Petition Secured Creditors (as defined below), and (ii) granting and authorizing the adequate protection proposed herein for the benefit of the Pre-Petition Secured Creditors; (b) authorizing the Debtors to enter into a debtor in possession financing facility (the "DIP Facility") with Adeptio Funding, LLC (the "DIP Lender" or "Adeptio Funding") and to obtain first priority secured postpetition financing on a priming basis (the "DIP Liens") in the aggregate principal amount of $[375,000] on an interim basis and $500,000 in the aggregate on a final basis; (c) scheduling a final hearing on the Motion (the "Final Hearing") to consider entry of a final order approving the Motion ; and (d) granting related relief.  The terms of the DIP Facility are substantially set forth in the term sheet (the "Term Sheet")[2] attached hereto as Exhibit A and the proposed form of Interim Order attached hereto as Exhibit B.

## STATUS OF THE CASE AND JURISDICTION

2.      On March 16, 2014 (the "Petition Date"), each Debtor commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code.  The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The Debtors have filed a motion seeking joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).

3.      In support of this Motion, the Debtors rely on the Declaration of Frank C. Bennett III in Support of the Debtors' Chapter 11 Petitions and First Day Relief (the "Bennett Declaration"), which is filed contemporaneous herewith and incorporated herein by reference.

---

[2] Unless otherwise defined herein, all capitalized terms shall have the meanings ascribed to such terms in the Term Sheet.

Additional information regarding the Debtors' history, its business operations and the events leading to the commencement of these cases can be found in the Bennett Declaration.

4.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the Amended Standing Order of Reference from the United States District Court for the District of Delaware dated as of February 29, 2012. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory and legal predicates for the relief sought herein are sections 105(a), 361, 362, 363, 364 and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001 and 9014 and Local Rule 4001-2.

### The Debtors' Prepetition Credit Facilities

5.      Each of the Debtors are obligors (Simplexity and Simplexity Services as borrowers and Holdings as guarantor) under that certain credit agreement dated as of December 15, 2009 (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), among Fifth Third Bank, an Ohio banking corporation, in its capacity as administrative agent (the "Prepetition Agent"), and the lenders party thereto (collectively, the "Pre-Petition Senior Secured Creditor"). The Credit Agreement provided for (i) a revolving loan commitment of up to $15 million (the "Prepetition Revolver"), and (ii) a $30 million term loan (the "Prepetition Term Loan" and, with the Prepetition Revolver, the "First Lien Credit Facility"). The Credit Agreement is purportedly secured by liens in substantially all of the Debtors' assets (the "Prepetition Collateral"), including their: (a) equipment, (b) inventory, (c) chattel paper, (d) accounts, (e) other pledged property and securities, (f) investment related property, (g) cash collateral accounts, (h) intellectual property and (i) commercial tort claims.

6.     In connection with exploring restructuring alternatives, the Debtors and the Pre-Petition Senior Secured Creditor entered into certain forbearance agreements from time to time.  Notwithstanding the prior forbearance agreements and the restructuring initiatives underway, on March 4, 2014, the Pre-Petition Secured Creditor delivered to the Debtors that certain Notice of Termination of Forbearance Period, Reservation of Rights, Additional Request for Information and Spoliation Notice (the "Bank Letter").  The Bank Letter provided that the Pre-Petition Secured Creditor intended to sweep all of the Debtors' cash on deposit and on a go forward basis, and to cease any advance of additional funds.

7.     As of the Petition Date, the total outstanding principal debt under the First Lien Credit Facility in the approximate amount of $33.5 million (the "Prepetition Secured Debt").

8.     In addition to the First Lien Credit Facility, Simplexity and Simplexity Services, as obligors, and Adeptio Funding, LLC, as Pre-Petition Junior Secured Creditor (the "Pre-Petition Junior Secured Creditor" and together with the Pre-Petition Senior Secured Creditor, the "Pre-Petition Secured Creditors"), are parties to that certain Amended and Restated Demand Promissory Note, dated May 29, 2013 (as amended, restated, supplemented or otherwise modified from time to time, the "Second Lien Credit Facility").  The obligations under the Second Lien Credit Facility are secured by the Prepetition Collateral.  As of the Petition Date, approximately $36,065,000 in principal amount of debt was outstanding under the Second Lien Credit Facility (the "Second Lien Debt").

9.      The intercreditor relationship among the Pre-Petition Secured Creditor and Adeptio Funding, in its capacity as second lien secured lender, is governed by that certain Subordination Agreement, dated April 3, 2013.[3]

10.     Adeptio Funding, in its capacity as secured lender under the Second Lien Credit Facility, has consented to the relief sought by this Motion, including the Debtors' use of cash collateral and the priming of its liens under the Second Lien Credit Facility.

## RELIEF REQUESTED

11.     By this Motion, the Debtors request that the Court (a) authorize (i) the Debtors' non-consensual usage of the Pre-Petition Secured Creditors' Cash Collateral, and (ii) the Debtors' provision of adequate protection to the Pre-Petition Secured Creditors for the usage of their Cash Collateral and the incurrence of all obligations under the DIP Facility, including fees and expenses (the "DIP Obligations"); (b) approve the Debtors' entry into the DIP Facility and to borrow up to $[375,000], on an interim basis, and up to $500,000 in the aggregate, on a final basis, thereunder; (c) schedule the Final Hearing on the Motion; and (d) grant such other and related relief necessary.  The Debtors submit that obtaining the relief requested herein is in the best interest of the Debtors, their estates and creditors and presents the best opportunity for the Debtors to maximize value from their assets and their estates through these cases for the benefit of all stakeholders.

---

[3] This section summarizes certain key contractual relationships pertaining to the financing of the Debtors' operations; however, the Pre-Petition Secured Creditor, Adeptio Funding and other parties are party to certain additional agreements in connection with the financing of the Debtors' operations that are not described herein.

A.      Usage of the Pre-Petition Secured Creditor' Cash Collateral
        and Priming the Pre-Petition Secured Creditor' Liens

        12.      In connection with their entry into the DIP Facility, the Debtors are

requesting that the Court authorize (i) the non-consensual usage of the Pre-Petition Senior

Secured Creditor's Cash Collateral, and the consensual usage of the Pre-Petition Junior Secured

Creditor's Cash Collateral, and (ii) the priming of the Pre-Petition Secured Creditors' Liens (as

defined below) in favor of the DIP Liens.  The Debtors have proposed an Adequate Protection

Package (as defined below) that the Debtors believe more than adequately protects the interests

of the Pre-Petition Secured Creditors in the Prepetition Collateral during these cases.

        13.      Absent obtaining postpetition financing, the value of the Debtors' assets

will be seriously diminished to the detriment of all stakeholders.  After negotiating, reviewing

and analyzing numerous strategic and sale alternatives in an effort to maximize value for

stakeholders, the Debtors determined to proceed with the Chapter 11 filing and the DIP Facility.

Importantly, the DIP Facility has no origination or commitment fees and may be satisfied at any

time without premium or prepayment penalty.  While the Debtors believe that an expedited sale

process is essential to maximizing the value of its assets, the DIP Facility does not impose strict

sale milestones so as to permit flexibility to bridge to a quick sale or to allow for the potential

that another party will emerge to fund a longer process.  In addition, interest and expenses can be

capitalized, further increasing the Debtors' liquidity.  The financing proposed under the DIP

Facility provides the Debtors with both the liquidity infusion and the financing timeline

necessary for the Debtors to maximize the value of their estates while enabling the Debtors to

avoid a forced liquidation of their assets at distressed values without an open process.

B.       The Pre-Petition Secured Creditors' Adequate Protection

14.       The Debtors are requesting the (i) non-consensual usage of the Cash Collateral of the Pre-Petition Senior Secured Creditor, and the consensual usage of the Pre-Petition Junior Secured Creditor's Cash Collateral, and (ii) priming of the liens on the Debtors' assets granted to the Pre-Petition Secured Creditors in connection with the First Lien Credit Facility and the Second Lien Credit Facility (the "Pre-Petition Secured Creditor' Liens"). In order to provide the Pre-Petition Secured Creditors with adequate protection, pursuant to sections 363(e) and 364(d)(1), the Debtors propose the following (the "Adequate Protection Package"):

a.       *Adequate Protection Liens.* Pursuant to Bankruptcy Code sections 361, 363(e) and 364(d), as adequate protection of the interests of the Pre-Petition Senior Secured Creditor in the Pre-Petition Collateral against any diminution in value of such interests in the Pre-Petition Collateral on account of (i) depreciation, physical deterioration, use, sale, loss, or decline in market value, (ii) the granting of the Postpetition Liens, (iii) the Debtors' use of cash and other Pre-Petition Collateral, and (iv) the imposition of the automatic stay, the Debtors will grant to the Prepetition Agent on behalf of the Pre-Petition Senior Secured Creditor, continuing valid, binding, enforceable and perfected postpetition security interests in and liens on the Collateral (the "Senior Replacement Liens"). The Senior Replacement Liens shall be junior in priority only to: (i) DIP Liens; (ii) the Carve-Out; and (iii) the Prepetition Liens on the Pre-Petition Collateral. The Senior Replacement Liens shall be senior to all other security interests in, liens on, or claims against any of the Collateral. (Interim Order, at ¶ 11(a).)

The Pre-Petition Junior Secured Creditor will receive similar replacement liens (the "Junior Replacement Liens"), which are junior in priority to the Senior Replacement Liens. (Interim Order, at ¶ 11(b).)

b.       *Adequate Protection Claim.* As further adequate protection of the interests of the Pre-Petition Senior Secured Creditor in the Pre-Petition Collateral against any diminution in value of such interests in the Pre-Petition Collateral on account of (i) depreciation, physical deterioration, use, sale, loss, or decline in market value, (ii) the granting of the DIP Liens, (iii) the Debtors' use of cash collateral and other Pre-Petition Collateral, and (iv) the imposition of the automatic stay, the Pre-Petition Senior Secured Creditor will be granted as and to the extent provided by Bankruptcy Code section 507(b) an allowed superpriority administrative expense claim in the Chapter 11 Cases and any Successor Case (the

"Senior Adequate Protection Priority Claim").  Except as set forth in the Interim Order, the Senior Adequate Protection Priority Claim shall have priority over all administrative expense claims and unsecured claims against the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to Bankruptcy Code sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c) (subject to entry of a final order), 507(a), 507(b), 546(c), 546(d), 726 (to the extent permitted by law), 1113 and 1114; provided, however, that the Senior Adequate Protection Priority Claim shall be junior in priority to the Superpriority Claim of the DIP Lender and the Carve-Out; provided further however, that the Senior Adequate Protection Priority Claim shall not recover from Avoidance Actions or Avoidance Proceeds, absent final order of this Court.  (Interim Order, at ¶ 11(c).)

The Pre-Petition Junior Secured Creditor will receive a similar super-priority claim (the "Junior Adequate Protection Priority Claim"), which is junior in priority to the Senior Adequate Protection Priority Claim. (Interim Order, at ¶ 11(d).)

As more fully set forth below, the Debtors also believe that the Pre-Petition Secured Creditor is adequately protected based on the Replacement Liens and the Adequate Protection Priority Claim, particularly given the modest amount of postpetition financing the Debtors are requesting under the DIP Facility to permit an orderly, albeit expedited, sale process.

C.    The DIP Facility

15.    The Debtors are requesting the authorization to enter into the DIP Facility, and to prime the Pre-Petition Secured Creditor' Liens on a non-consensual basis.  The pertinent terms of the DIP Facility are:[4]

  a.    *Borrowers*.  Simplexity, LLC, a Delaware limited liability company

  b.    *Guarantors*.  Simplexity Services, LLC and Adeptio INPC Holdings, LLC, each of which are Delaware limited liability companies.

---

[4]  The description of the DIP Facility set forth herein are fully qualified by the Term Sheet and the Interim Order, and parties in interest are advised to review both of these documents in their entirety.  Unless otherwise defined herein, all capitalized terms used in this description of the DIP Facility shall have the meanings ascribed to them in the Interim Order or the Term Sheet.

c.      *DIP Lender*. Adeptio Funding LLC, a Delaware limited liability company.[5]

d.      *Maximum Availability*. $500,000 plus the amount of any interest or Permitted Expenses that are added to the principal amount of the loan (as provided below).

e.      *Purpose*. Finance necessary expenses and professional fees pursuant to the Agreed Budget as determined by the DIP Lender in its sole discretion in furtherance of an orderly sale of Simplexity's businesses and assets for the minimum time necessary to obtain long-term DIP financing or consummate a sale of Simplexity's business and assets for the benefit of its creditors.

For the avoidance of doubt, no portion of the DIP Facility, the collateral securing the DIP Facility, the proceeds of the DIP Facility or the Carve-Out may be used in connection with the investigation (including discovery proceedings), initiation or prosecution of any claims, causes of action, objection or other litigation against Adeptio Funding LLC.

f.      *Maturity Date*. All amounts outstanding (including accrued and unpaid interest and any interest or Permitted Expenses added to the principal amount of the loan) shall be paid in full on the date 45 days from the Petition Date.

g.      *Availability*. If the Debtors do not have cash on hand sufficient to satisfy five business days of reasonably anticipated expenses, advances under the DIP Loan will be made available pursuant to the Agreed Budget set forth in Annex B to the Interim Order. The Debtor is authorized to draw the amount necessary to satisfy 5 business days of reasonably anticipated net expenses one time per week, provided DIP Lender will fund only if: (i) the Debtor provides evidence satisfactory to the DIP Lender that the requested amount does not exceed the difference between reasonably anticipated receipts and disbursements for the next five business days, (ii) the Debtor delivers an updated budget acceptable to the DIP Lender, which includes uses for the requested draw (which, upon approval by the DIP Lender shall amend and replace the Agreed Budget set forth on Annex B to the Interim Order), and (iii) the total amount funded, including the requested draw, is equal to or less than Delayed Draw Term Loan Maximum Amount.

h.      *Priority*. Pursuant to section 364(c)(1) of the Bankruptcy Code, all amounts owing by the Debtors under the DIP Facility at all times will constitute allowed super-priority administrative expense claims in the

---

[5] The DIP Lender is an affiliate of the direct or indirect (as applicable) owners of each of the Debtors.

Chapter 11 Cases having priority over all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, subject only to the Carve-Out.

i.     *Security*. Subject only to the Carve Out, a fully-perfected first priority senior priming security interest in and lien upon all pre- and post-petition property of the Debtors.

j.     *Carve Out*. The "Carve Out" means (i) all fees and interest required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee pursuant to section 1930(a) of title 28 of the United States Code and section 3717 of title 31 of the United States Code, (ii) all reasonable fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code in an amount not exceeding $10,000 and (iii) any and all allowed and unpaid claims of any professional of the Debtors or the statutory committee of unsecured creditors appointed in these Cases whose retention is approved by the Bankruptcy Court during the Cases pursuant to sections 327 and 1103 of the Bankruptcy Code for unpaid fees and expenses (A) prior to the occurrence of an Event of Default (as defined in the DIP Term Sheet) to the extent included in the Budget and (B) at any time after the occurrence and during the continuance of an Event of Default in an aggregate amount not exceeding $50,000, *provided* that the dollar limitation in this clause (iii) on fees and expenses shall neither be reduced nor increased by the amount of any compensation or reimbursement of expenses incurred, awarded or paid prior to the occurrence of an Event of Default in respect of which the Carve Out is invoked or by any fees, expenses, indemnities or other amounts paid to the DIP Lender or any of the foregoing's respective attorneys, advisors and agents.

k.     *Interest Rate*. 10% of the outstanding principal amount per annum, calculated as .02777% per day. DIP Lender shall capitalize and add interest to the principal amount of the DIP Loan. Lender shall record such capitalized interest on the Schedule of Borrowing.

l.     *Origination, Commitment and Administrative Fees*. None.

m.     *Permitted Expenses (paid in kind)*. The Borrower shall reimburse the DIP Lender for all reasonable and documented costs and expenses, including legal fees, in connection with the negotiation, documentation, execution, and administration of the Financing. DIP Lender shall capitalize and add such expenses to the principal amount of the DIP Loan. Lender shall record such capitalized expenses on the Schedule of Borrowing.

n.     *Voluntary Repayments*. The Debtors may voluntarily prepay the DIP Loan, in full but not in part, at any time without premium or penalty. Prepayment in full means prepayment of all amounts on the Schedule of

Borrowings which shall include principal (including interest and expenses added to principal), any accrued and unpaid interest to the prepayment date plus expenses accrued and unpaid to the prepayment date. Upon prepayment of all outstanding amounts under the DIP Loan, the DIP Lender's obligations hereunder shall terminate. Amounts repaid may not be reborrowed.

o.   *Mandatory Repayments*. Unless the DIP lender otherwise agrees in writing, the DIP Loan shall be prepaid out of the 100% of the net cash proceeds of the sale of any of property of the Debtors and 100% of Qualified Funds received by the Debtor. Upon prepayment of all outstanding amounts under the DIP Loan, the DIP Lender's obligations hereunder shall terminate.

p.   *Affirmative and Negative Covenants*. Financing proceeds shall be maintained in a bank account at a financial institution acceptable to the DIP Lender. Debtors shall make commercially reasonable efforts to deposit cash collateral in a bank account at a financial institution acceptable to the DIP Lender. Debtors shall not make any payments to any person or incur any obligations without DIP Lender's written consent. Absent the DIP Lender's written consent or order of the Court, Debtors shall not sell any property unless cash proceeds are sufficient to prepay the DIP Loans in full.

q.   *Approved Budget*. The budget attached as Annex B to the Interim Order, with such changes as may be approved by the DIP Lender in its sole discretion.

r.   *Event of Default*. Events of Default are defined fully in the Term Sheet, but in summary include certain events of: (1) Non-Payment; (2) Covenant Breach; (3) Inconsistent Action; (4) Failure to Fund According to Budget; (5) Change of Control; (6) Dismissal or Conversion of Cases; (7) Relief from Automatic Stay; (8) Certain Orders; and (9) Pre-Petition Payments.

s.   *Indemnification*. Debtors indemnify and holds harmless the DIP Lender and its respective affiliates and their respective directors, officers, employees, advisors, agents and other representatives, each solely in their capacity as related to the DIP Lender and the DIP Loans (each, an "Indemnified Person") from and against any and all losses, claims, damages and liabilities to which any such Indemnified Person may become subject arising out of or in connection with the Financing, the use of the proceeds thereof or any claim, litigation, investigation or proceeding (a "Proceeding") relating to any of the foregoing, regardless of whether any indemnified person is a party thereto, regardless of who brings the Proceeding. The Debtors agree to reimburse each indemnified person upon demand for any reasonable legal or other out-of-pocket expenses incurred in connection with investigating or defending any of the

foregoing. DIP Lender is authorized to advance from the DIP Loan an amount equal to such amount. However, the foregoing indemnity will not, as to any Indemnified Person, apply to losses, claims, damages, liabilities or related expenses to the extent they are found by a final, nonappealable judgment of a court of competent jurisdiction to arise from the willful misconduct of the Indemnified Person.

t.      *Schedule of Borrowings*.  Lender shall maintain a schedule of drawings, payments, capitalized interest and expenses, and any accrued and unpaid not yet capitalized (the "Schedule of Borrowing") and absent manifest error such schedule will be conclusive evidence of amounts owing.

u.      *Qualified Funds*.  Weekly gross receipts in excess of the amount forecasted in the Budget and 100% of all gross receipts in excess of $100,000 in any five business day period.

v.      *Reports*.  Borrower will provide DIP Lender access to all books and records of the Debtors, as well as unrestricted access to Debtors' financial advisor, professionals or employees.

16.      In accordance with Local Rule 4001-2(a)(i), the Debtors highlight for the Court the following provisions included in the DIP Facility:

*a.*      Local Rule 4001-2(a)(i)(B) – Since no investigation period or release is requested by the DIP Lender, this provision does not apply.

*b.*      Local Rule 4001-2(a)(i)(C) requires disclosure of any provision which seeks to waive, without notice, whatever rights the estate may have under section 506(c) of the Bankruptcy Code. The Debtors are seeking a 506(c) waiver, but only subject to a final order. (Interim Order, at ¶ 8.)

*c.*      Local Rule 4001-2(A)(I)(D) requires the disclosure of provisions that immediately grant to prepetition secured creditors liens on the debtor's claims and causes of action arising under sections 544, 545, 547, 548 and 549 of the Bankruptcy Code (collectively "Avoidance Actions"). While the DIP Facility does not grant any liens on Avoidance Actions to the Pre-Petition Secured Creditor, the Debtors highlight for the Court that the DIP Lender will have a Superpriority Claim that may be satisfied from the proceeds of Avoidance Actions, subject to entry of the Final Order. (Interim Order, at ¶ 6(a).)

*d.*      Local Rule 4001-2(A)(I)(F).  Both the Debtors and the Committee are subject to the Carve-Out, which is tied to the Budget (which includes different budgeted amounts for each) prior to an Event of Default and treated equally post any Event of Default.

*e.*     Local Rule 4001-2(a)(i)(G) requires disclosure of any provision which seeks to prime any secured lien without the consent of that lienor. The DIP Facility provides for the priming of the Pre-Petition Secured Creditors' Liens and the Debtors do not believe that the Pre-Petition Senior Secured Creditor consents to such priming. (Interim Order, at ¶ 6(b).) Nonetheless, the priming of the Pre-Petition Secured Creditor' Liens was a necessary condition to entering into the DIP Facility, and the Debtors believe that the DIP Facility presents the Debtors' best available financing proposal. Moreover, as demonstrated below, the Pre-Petition Secured Creditors are more than adequately protected for the priming of their liens. Accordingly, the Debtors believe that the proposed priming provisions are appropriate.

*f.*     Local Rule 4001-2(A)(I)(H). Subject to a final order, the Debtors are seeking a waiver of the "equities of the case" exception under 11 U.S.C. § 552(b). (Interim Order, at ¶ 15.)

## APPLICABLE AUTHORITY

A.     Use of Cash Collateral

17.     Section 363 of the Bankruptcy Code governs a debtor's use of property of its estate.[6] Section 363(c)(1) of the Bankruptcy Code provides that:

> If the business of the debtor is authorized to be operated under Section . . . 1108 . . . of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(1).

18.     Section 363(c)(2) of the Bankruptcy Code, however, provides an exception with respect to "cash collateral" to the general grant of authority to use property of the estate in the ordinary course set forth in section 363 of the Bankruptcy Code. Specifically, a

---

[6] Pursuant to section 1107 of the Bankruptcy Code, a debtor in possession has all of the rights and powers of a trustee with respect to property of the estate, including the right to use property of the estate in compliance with section 363 of the Bankruptcy Code. See 11 U.S.C. § 1107(a).

trustee or debtor-in-possession may not use, sell, or lease "cash collateral" under subsection (c)(1) unless:

> (A)    each entity that has an interest in such collateral consents; or
>
> (B)    the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

11 U.S.C. § 363(c)(2).

19.    The Debtors submit that, under the circumstances here, their request to use Cash Collateral should be approved. Absent access to the usage of Cash Collateral, the Debtors have no liquidity and the Debtors' efforts to preserve and maximize the value of their estates during these cases would be significantly impaired. While the DIP Lender has expressly consented to the use of any Cash Collateral they advance (satisfying the requirements of section 363(c)(2)(A) of the Bankruptcy Code) and has also consented in its capacity as Pre-Petition Junior Secured Creditor, the Pre-Petition Senior Secured Creditor has not consented to the use of their Cash Collateral. However, the Debtors are nonetheless compelled to request approval for the usage of the Pre-Petition Senior Secured Creditor's Cash Collateral in order to have access to sufficient funds to operate their business. The Pre-Petition Senior Secured Creditor's interest in the Cash Collateral is adequately protected by the proposed Adequate Protection Package, and the Court should authorize the usage of the Pre-Petition Secured Creditors' Cash Collateral.

*The Need to Use Cash Collateral*

20.    The Debtors have proposed to use the Cash Collateral of the Pre-Petition Secured Creditor, as well as the borrowings under the DIP Facility, pursuant to the Approved Budget, in order to fund these cases. As of the Petition Date, the Debtors had no unencumbered cash with which to operate their business, and all of the Debtors' receipts (which constitute the

Pre-Petition Senior Secured Creditor' Cash Collateral), other than those that may have been received shortly prior to the filing of these cases, were applied to reduce the Prepetition Senior Secured Debt.  To ensure a smooth entry into chapter 11, the Debtors need the use of Cash Collateral to maintain their assets, provide financial information, pay necessary employees, vendors, overhead, and other expenses necessary to maximize the value of the Debtors' estates. However, in order to permit the Debtors sufficient time and security to bridge to a sale, the Debtors anticipate the need to supplement their use of Cash Collateral with the funding being provided by the DIP Facility.  As the Debtors cannot operate their business and pursue their chapter 11 strategy using the funds provided under the DIP Facility alone, it is imperative that the Debtors obtain authority to use Cash Collateral subject to the terms outlined in this Motion and the Term Sheet.  Accordingly, in order to avoid immediate and irreparable harm to the Debtors' business operations and their estates, the Debtors have an immediate need for authority to use Cash Collateral.

*Adequate Protection*

21.    Section 363(c)(2) of the Bankruptcy Code provides that a debtor may not use, sell or lease cash collateral unless "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2).  To use cash collateral without the lienholder's consent and to use other property in which a creditor claims an interest, the debtor is required to provide the lienholder with adequate protection of its interest in the cash collateral and other property in which an interest is claimed.  Further, Bankruptcy Code section 363(e) provides, in pertinent part, that "on request of an entity that has an interest in property . . . proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall

prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e). Examples of adequate protection are provided in section 361 of the Bankruptcy Code and include, but are not limited to: (a) lump sum or periodic cash payments to the extent that such use will result in a decrease in value of such entity's interest in the property; (b) provisions for an additional or replacement lien to the extent that the use of the property will cause a decrease in the value of such entity's interest in the property; and (c) such other relief as will result in the realization by the entity of the indubitable equivalent of such entity's interest in the property. 11 U.S.C. § 361.

22.     Adequate protection must be determined on a case-by-case basis, in light of the particular facts and circumstances presented, the focus being that which is required to protect a secured creditor from diminution in the value of its interest in the particular collateral during the use period. *In re Ledgmere Land Corp.*,116 B.R. 338, 343 (Bankr. D. Mass. 1990); *Delbridge v. Production Credit Assoc. and Federal Land Bank*, 104 B.R. 824, 827 (E.D. Mich. 1989); *In re Kain*, 86 B.R. 506, 513 (Bankr. W.D. Mich. 1988); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986).

23.     Pursuant to sections 361 and 363(e) of the Bankruptcy Code, the Debtors are prepared to adequately protect the Pre-Petition Secured Creditor to the extent: (i) they are secured; and (ii) there is any diminution in the value of the prepetition collateral resulting from the Debtors' use of the Cash Collateral. The Debtors submit that the Adequate Protection Package satisfies the requirements that the Debtors provide the Pre-Petition Secured Creditor with adequate protection for the use of their Cash Collateral. The Adequate Protection Package consists of the Replacement Liens and Adequate Protection Priority Claim. The Debtors believe

that the foregoing Adequate Protection Package provides the Pre-Petition Secured Creditor with sufficient adequate protection of their interest in the Prepetition Collateral during these cases.

24.     In addition, all cash expended pursuant to the Budget is designed to increase the value of the Prepetition Collateral. The technical nature of the Debtors' primary assets (i.e. software and systems) requires maintenance, oversight and knowledgeable personnel during the marketing and sale process. Accordingly, the Debtors respectfully submit that the use of Cash Collateral on the terms set forth herein and in the attached proposed Term Sheet and Interim Order provide the Pre-Petition Secured Creditor with adequate protection and is in the best interest of the Debtors, their estates, their creditors and all parties in interest and therefore should be authorized by this Court.

B.      The DIP Facility Should Be Approved

25.     The Debtors propose to obtain financing under the DIP Facility by providing security interests and liens as set forth above pursuant to sections 364(c) and (d) of the Bankruptcy Code. The statutory requirement for obtaining postpetition credit under section 364(c) is a finding, made after notice and hearing, that the debtors are "unable to obtain unsecured credit allowable under section 503(b)(1) of the [the Bankruptcy Code]." 11 U.S.C. § 364(c). Indeed, section 364(c) financing is appropriate when the debtor in possession is unable to obtain unsecured credit allowable as an ordinary administrative claim. *See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990) (debtor must show that it has made a reasonable effort to seek other sources of financing under sections 364(a) and (b) of the Bankruptcy Code); *In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c)(2) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).

26.     Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code.  Specifically, courts look to whether:

> (a)     the debtor is unable to obtain unsecured credit under section 364(b), *i.e.*, by allowing a lender only an administrative claim;
>
> (b)     the credit transaction is necessary to preserve the assets of the estate; and
>
> (c)     the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.

*In re Ames Dep't Stores*, 115 B.R. at 37-39.

27.     The Debtors have determined that adequate postpetition financing on an unsecured basis or on a junior priority basis to the Pre-Petition Lenders is not available.  Without postpetition financing, the Debtors would be unable to bridge to a sale process, which would significantly impair the value of the Debtors' assets to the detriment of all stakeholders.  Furthermore, by obtaining postpetition financing, the Debtors will be in a position to preserve and maximize the value of their assets for the benefit of all creditors.  Finally, the terms of the DIP Facility are fair, reasonable and adequate given the Debtors' circumstances, all as more fully set forth below.

C.     Approval of Priming Liens and Adequate Protection under Section 364(d)

28.     If a debtor is unable to obtain adequate credit under the provisions of section 364(c) of the Bankruptcy Code, the debtor may obtain credit secured by a senior or equal lien on property of the estate that is already subject to a lien, commonly referred to as a "priming lien." 11 U.S.C. § 364(d).  Section 364(d)(1) of the Bankruptcy Code, which governs the incurrence of postpetition debt secured by senior or "priming" liens, provides that the court may,

after notice and a hearing, authorize the obtaining of credit or the incurring of debt secured by a

senior or equal lien on property of the estate that is subject to a lien only if—

> (a)    the trustee is unable to obtain such credit otherwise; and

> (b)    there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d).

      29.     The determination of adequate protection is a fact-specific inquiry to be

decided on a case-by-case basis. *See In re Mosello*, 195 B.R. 277, 288 (Bankr. S.D.N.Y. 1996).

"Its application is left to the vagaries of each case . . . but its focus is protection of the secured

creditor from diminution in the value of its collateral during the reorganization process." Id.

(quoting *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986)).  The Debtors have

concluded that adequate and acceptable alternative financing on a non-priming basis and on

terms more favorable than those being provided by the DIP Lender under the DIP Facility is

currently unobtainable.

      30.     Following the receipt of the proposal from the DIP Lender, the Debtors

proceeded to expeditiously negotiate with the DIP Lender.  The Debtors ultimately concluded

that the DIP Facility represented the best available financing for the Debtors under the

circumstances.  The Debtors believe that financing on the same or comparable terms (both

monetary and non-monetary) is otherwise unavailable.  In particular, the DIP Facility has no

origination fees, no commitment fees and no prepayment premiums or penalties.  Nonetheless,

the Debtors have proposed the Adequate Protection Package to protect the Pre-Petition Senior

Secured Creditors' interest in the Prepetition Collateral, to the extent that there is any diminution

in the Pre-Petition Senior Secured Creditor' interest therein.  Because the Debtors have

demonstrated that (i) the same or superior financing is otherwise unavailable, and (ii) the Pre-Petition Secured Creditor will be adequately protected, Section 364(d) has been met and the Court should authorize the priming of the Pre-Petition Senior Secured Creditors' Liens by the DIP Liens in connection with the DIP Facility.

31.    A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) and (d) of the Bankruptcy Code. *See In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992).

32.    Substantially all of the Debtors' assets are subject to the Pre-Petition Senior Secured Creditors' Liens. Because of the amount of the Pre-Petition Senior Secured Creditors' secured claims, as well as the Second Lien Debt, obtaining the financing needed by the Debtors as unsecured debt or debt which would be secured by liens junior to the liens of the Pre-Petition Secured Creditor was not a realistic option.

33.    The proposed terms of the DIP Facility are fair, reasonable, and adequate under the circumstances. First and foremost, as discussed more fully above, the Debtors have made an appropriate, good-faith effort to obtain credit on the most favorable terms currently available given the circumstances.

34.    Against this backdrop, the Debtors carefully evaluated the proposed financing structure from the DIP Lender, evaluated their ability to, and the risks associated with, priming the Pre-Petition Senior Secured Creditor' Liens, engaged in negotiations with the DIP Lender regarding the Term Sheet, worked with their various advisors to obtain the best possible pricing and terms from the DIP Lenders, and, just prior to commencing these cases, determined that the DIP Lender's proposal was best suited to the Debtors' needs given the circumstances.

Moreover, the terms and conditions of the DIP Facility were negotiated by the parties in good faith and at arm's length, and, as outlined above, were instituted for the purpose of enabling the Debtors to meet ongoing operational expenses in Chapter 11 while preserving and maximizing the value of the Debtors' estates.

35.     The proposed DIP Facility provides that the security interests and administrative expense claims granted to the DIP Lenders and the Pre-Petition Secured Creditor are subject to the Carve-Out.  In *In re Ames Dep't Stores*, 115 B.R. 34 (Bankr. S.D.N.Y. 1990), the court found that such "carve-outs" are not only reasonable, but are necessary to ensure that official committees and the debtor's estate will be assured of the assistance of counsel.  Id. at 40.

36.     Likewise, the fees and expenses required by the DIP Lender under the DIP Facility are reasonable and appropriate under the circumstances.  As stated previously, there are no origination, commitment or administrative fees and reimbursable expenses are qualified by their reasonableness.  Indeed, courts routinely authorize similar lender incentives beyond the explicit liens and other rights specified in section 364 of the Bankruptcy Code.  *See, e.g., In re Defender Drug Stores, Inc.*, 145 B.R. 312, 316 (9th Cir. BAP 1992) (authorizing credit arrangement under section 364, including a lender "enhancement fee").

37.     Pursuant to section 364(e) of the Bankruptcy Code, any reversal or modification on appeal of an authorization to obtain credit or incur debt or a grant of priority or a lien under section 364 of the Bankruptcy Code shall not affect the validity of that debt incurred or priority or lien granted as long as the entity that extended credit "extended such credit in good faith." *See* 11 U.S.C. § 364(e).  Courts generally hold that "good faith" in the context of postpetition financing means, consistent with the Uniform Commercial Code, honesty in fact in the conduct or transaction concerned. *See Unsecured Creditors' Comm. v. First Nat'l Bank &*

*Trust Co. (In re Ellingsen MacLean Oil Co.)*, 834 F.2d 599, 605 (6th Cir. 1987) (citing U.C.C. § 1-201(19)).

38.     As explained in detail herein, the terms of the DIP Facility were negotiated at arm's length and reflect the most advantageous terms (including availability, pricing, fees and flexibility) available to the Debtors in light of their financial circumstances. Following a break-down of discussions with the Pre-Petition Senior Secured Creditor with respect to funding an orderly sales process, at the request of the Debtors, the DIP Lender agreed to provide the DIP Facility to facilitate the Debtors' attempt to maximize value by providing the Debtors with the requisite liquidity to attempt to conduct a competitive sale process.

39.     Accordingly, the Debtors believe that the DIP Facility obligations will be extended by the DIP Lender in good faith (as such term is used in section 364(e) of the Bankruptcy Code).  No consideration is being provided to any party to, or guarantor of, obligations arising under the DIP Facility, other than as set forth herein and in the Interim Order. Moreover, the DIP Facility has been extended in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and the DIP Lender should be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that the Interim Order or any provision thereof is vacated, reversed, or modified on appeal or otherwise.  Given the circumstances, the terms of the DIP Facility are fair, reasonable and adequate, and the DIP Lender under the DIP Facility should be accorded the benefits of section 364(e) of the Bankruptcy Code in respect of such agreement.

D.     Interim Approval Should Be Granted

40.     Bankruptcy Rules 4001(b) and (c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code may not be commenced earlier than fifteen (15) days after the service of such motion.  Upon request, however, the Court is

empowered to conduct a preliminary expedited hearing on the motion and authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to the Debtors' estates.

41.     The Debtors request that the Court hold and conduct an interim hearing immediately to consider entry of the proposed Interim Order. This relief will enable the Debtors to operate their businesses in a manner that will permit them to preserve and maximize value and, therefore, avoid immediate and irreparable harm and prejudice to their estates and all parties in interest, pending the Final Hearing.

## REQUEST FOR FINAL HEARING

42.     The Debtors further respectfully request that this Court schedule the Final Hearing and authorize it to serve a copy of the signed Interim Order, which fixes the time and date for the filing of objections, by first-class mail upon (i) the United States Trustee for the District of Delaware; (ii) counsel to the DIP Lender; (iii) counsel to the Prepetition Agent; (iv) any known lienholders of the Debtors; (v) the United States Internal Revenue Service; (vi) the parties included on the Debtors' list of twenty-five (25) creditors holding the largest unsecured claims; (vii) the holder of the Second Lien Debt; (viii) counsel to the Committee, once appointed; and (ix) any party who filed a request for notices in these chapter 11 cases prior to the date set forth in the Interim Order for service of notice of the Final Hearing or would otherwise be entitled to notice pursuant to Bankruptcy Rule 2002. The Debtors request that the Court consider such notice of the Final Hearing to be sufficient notice under Bankruptcy Rule 4001 and Local Rule 2002-1.[7]

---

[7] Local Rule 2002-1(b) provides that "[i]n cases under chapter 11, all motions . . . shall be served only upon counsel for the debtor, the United States Trustee, counsel for all official committees, all parties who file a request for service of notices pursuant to Fed. R. Bankr. P. 2002(i), and on any party whose rights are affected by the motion. If an

## NOTICE

43.     Notice of this Motion has been provided to: (i) the Office of the United States Trustee; (ii) the Debtors' twenty-five (25) largest unsecured creditors on a consolidated basis; (iii) counsel to the Prepetition Agent; (iv) counsel to the DIP Lender; (v) the holder of the Second Lien Debt; and (v) such other parties entitled to notice pursuant to Local Rule 9013-1(m).  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

WHEREFORE, the Debtors respectfully request immediate entry of the Interim Order, in the form annexed hereto, granting the Debtors the relief requested herein; following additional notice and a hearing, the entry of a Final Order granting the relief requested herein; and granting such other and further relief as is just.

Dated:     March 17, 2014
           Wilmington, Delaware              YOUNG CONAWAY STARGATT
                                             & TAYLOR, LLP


                                             /s/ Robert S. Brady
                                             Robert S. Brady (No. 2847)
                                             Edmon L. Morton (No. 3856)
                                             Sean M. Beach (No. 4070)
                                             Rodney Square
                                             1000 North King Street
                                             Wilmington, Delaware  19801
                                             Telephone: (302) 571-6600
                                             Facsimile: (302) 571-1253

                                             *Proposed Counsel for Debtors and
                                             Debtors in Possession*

---

official unsecured creditors' committee has not been appointed, service shall be made on the 20 largest unsecured creditors in the case in lieu of the committee."