**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | ) Chapter 11 ) |
| Simplexity, LLC, *et al.*,[1] | ) ) Case No. 14-10569 (KG) ) |
| Debtors. | ) (Jointly Administered) ) |
| | ) **Re: D.I. 443** ) |

**OBJECTION OF FIFTH THIRD BANK TO MOTION OF
OFFICIAL COMMITTEE OF UNSECURED CREDITORS
FOR DERIVATIVE STANDING**

Fifth Third Bank, in its capacity as DIP Agent and Pre-Petition Senior Secured Agent (each as defined in the DIP Order[2]) ("*Fifth Third*"), by and through its undersigned counsel, objects to the motion for derivative standing (D.I. 443, the "*Motion*") of the Official Committee of Unsecured Creditors (the "*Committee*"). In support of its objection, Fifth Third states as follows:

**INTRODUCTION**

Having found no wrong-doing by Fifth Third after months of investigation, the Committee still wants the Court to authorize highly speculative litigation and to disregard reasonable settlement offers from Fifth Third. Granting that request would be imprudent and contravene the test for derivative standing in this Circuit.

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Simplexity, LLC (9770); Simplexity Services, LLC (2823); and Adeptio INPC Holdings, LLC (4699). The Debtors' mailing address is 10790 Parkridge Blvd., Suite 200, Reston, VA 20191.

[2] "DIP Order" means the *Final Order (I) Authorizing Debtors (A) to Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and (B) to Utilize Cash Collateral Pursuant to 11 U.S.C. § 363 and (II) Granting Adequate Protection to Pre-Petition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363 and 364* [D.I. 145]. Capitalized terms used but not otherwise defined herein shall have the meanings ascribed thereto in the DIP Order.

The Motion also makes conversion of these cases more compelling. If the Committee is granted derivative standing, it will seek compensation under Code § 330 for those efforts – whether or not there has been a recovery. In chapter 7, creditors can seek the same standing if they believe in the Committee's claims, but they would in all events be limited to reimbursement under Code §§ 503(b)(3) and 503(b)(4). Conversion would not prejudice the alleged claims but would require what the Committee could try to avoid: proceeding on a contingency basis if a chapter 7 trustee agrees that litigation with Fifth Third is not appropriate.

## ARGUMENT

The Motion is substantively flawed for several reasons.

First, the Debtors are still working to settle the alleged claims against Fifth Third, and, therefore, are not refusing to pursue them. The Committee may prefer to lead settlement negotiations, but that is not a basis for derivative standing. And even if the Debtors consent to the Committee's request to sue Fifth Third, that does not confer standing. The *Cybergenics* test must always be satisfied.

Second, the Debtors' determination not to sue Fifth Third is completely justified. Most of the Committee's claims would not survive a motion to dismiss, and the others are insignificant or conceded. Accordingly, the Debtors' determination not to sue Fifth Third appropriately weighs a low likelihood of success on the merits, the relative size of any judgment vis-à-vis the level at which Fifth Third has already indicated it would settle, and the costs of litigation in a case that is already crushed by millions of dollars of unpaid professional fees.

Third, the Committee's request for "exclusive" derivative standing amounts to a motion for a special examiner with the right to sue. Clearly, the Committee is not disinterested: it exclusively represents the WARN and trade claimants. Derivative standing does not go so far as the Motion requests and permit exclusive standing.

-2-
RLF1 10881520v.1

Fourth, the particular circumstances of these cases make derivative standing for the Committee counter-productive. So many unpaid professional fees have been incurred that they exceed the $2 million DIP Obligations and rival the $5 million of alleged wage priority claims. As such, these cases have turned into a three-way competition among unpaid estate professionals (led by the Committee's counsel), wage priority claimants (represented by the chairman of the Committee), and Fifth Third. The Debtors have largely served the role as gatekeeper in such settlement struggle. Granting the Motion would remove any control that remains over this process and further delay resolution of these cases.

This litany of problems illustrates the lack of basis for granting the Motion. The Court should deny it and not permit unnecessary and baseless litigation against Fifth Third.

## I. THE COMMITTEE FAILS TO MEET ITS BURDEN UNDER THE *CYBERGENICS* TEST.

In this Circuit, a creditor's committee may be authorized to "sue derivatively to recover property for the benefit of the estate." *In re Yes! Entm't Corp.*, 316 B.R. 141, 145 (D. Del. 2004); *see also Official Comm. ex rel. Cybergenics v. Chinery (Cybergenics II)*, 330 F.3d 548, 560-61 (3d Cir. 2003). Such derivative standing requires: "(1) a colorable claim, (2) that the trustee unjustifiably refused to pursue the claim, and (3) the permission of the bankruptcy court to initiate the action." *In re Yes!*, 316 B.R. at 145. The movant for derivative standing carries the burden of proving the first two elements. *In re STN Enters.*, 779 F.2d 901, 905 (2d Cir. 1985).

### A. The Debtors Have Not Refused to Pursue the Committee's Alleged Claims, and Any Consent They Might Give to the Motion Is Irrelevant.

As a threshold matter, the Debtors have not refused to pursue the claims that the Committee has alleged against Fifth Third. The Debtors have expressly elected to administer them towards a settlement. Litigation, trial and judgment are not the only means of pursuit. This

-3-

is not a situation where the Debtors have abandoned the alleged claims, attributed no value to them, or done nothing with them. The Debtors have spent weeks negotiating with Fifth Third over settlement of these same matters. *See* D.I. 473, Second Mot. of Fifth Third Bank to Convert These Cases to Cases Under Chapter 7 ¶ 8 ("*Second Conversion Motion*"); *see also* Letter from Robert S. Brady, Esq., Young Conaway Stargatt & Taylor, LLP, to Michael P. Richman, Esq., Hunton & Williams LLP (Sept. 17, 2014) (a true and correct copy of which is attached as Exhibit A, the "*Determination Notice*"). That the Committee might object to a settlement achieved by the Debtors does not create refusal. Moreover, that puts the cart before the horse and assumes an objection would be successful. Unless the Debtors give up on settlement or the Court rejects a settlement from them, the Committee is not entitled to derivative standing. *See Fogel v. Zell*, 221 F.3d 955, 965-67 (7th Cir. 2000) (debtor was found to have unjustifiably refused to sue despite its reaching a settlement with defendants, only because the court deemed that settlement invalid).

The Committee is likely to point to the section of the Determination Notice where the Debtors indicate they would consent to the Committee seeking derivative standing. This is a red herring. In the same breath, the Determination Notice confirms that the Debtors have not given up administration of the disputed matters. At worst, the partial consent is an attempt to appease the Committee who vociferously accused the Debtors of breaching their duties in the Motion. Moreover, this issue has nothing to do with the *Cybergenics* test or derivative standing. The Third Circuit considered the factor of a debtor's consent in *Cybergenics* and chose not to make that part of its ruling. *See Official Comm. of Unsecured Creditors v. Cablevision Sys. Corp. (In re Valley Media, Inc.)*, Adv. No. 02-04553 (PJW), 2003 WL 21956410, at *2 (D. Del. Aug. 14, 2003) (quoting *In re Commodore Int'l Ltd.*, 262 F.3d 96, 100 (2d Cir. 2001)) (citing

-4-

*Cybergenics*, 330 F.3d at 563, 568-69 (delinquency of the debtor, not its consent, was the relevant test factor).

      **B.    The Debtors Are Justified in Their Decision Not to Sue Fifth Third on Any of the Alleged Claims, as Most of Them Are Not Colorable and the Rest Are Insignificant or Conceded.**

Settling with Fifth Third is a far better outcome for these estates than litigation. This is clear from the cost-benefit analysis that the Debtors have used and that the Court should use. *See, e.g.*, *In re Martin*, 91 F.3d 389, 393 (3d Cir. 1996) (factors courts should consider include "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors"). In this proceeding, the likelihood of each claim's success can be efficiently achieved when also considering if they are colorable. Determining if any of the claims are even colorable undertakes the "same analysis as when a defendant moves to dismiss a complaint for failure to state a claim." *In re Optim Energy*, No. 14-10262, slip op. at 10 (Bankr. D. Del. May 13, 2014) (quoting *In re Centaur, LLC*, No. 10-10799 (KJC), 2010 WL 4624910, at *4 (Bankr. D. Del. Nov. 5, 2010). The motion to dismiss standard is well-known: "[to] survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Optim Energy*, slip op. at 10 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. As discussed in detail below, the Motion fails to reach even these relatively low level standards.

Assessing the Debtors' justification also requires considering whether litigation needlessly risks further depleting the estates. *See, e.g.*, *In re Nat'l Forge Co.*, 326 B.R. 532, 548 (W.D. Penn. 2005); *La. World Exposition v. Fed. Ins. Co.*, 858 F.2d 233, 219, 253 (5th Cir.

1988); *Tenn. Valley Steel Corp. v. B.T. Commercial Corp. (In re Tenn. Valley Steel Corp.)*, 183 B.R. 795, 806 (E.D. Tenn. 1995). Parties and the Court ought to avoid "unduly expos[ing] the Debtors to the demands of creditors preferring to risk estate assets in a litigation lottery." *In re Capmark Fin. Grp. Inc.*, 438 B.R. 471, 519 (Bankr. D. Del. 2010). *See also In re Ambac Fin. Grp., Inc.*, 457 B.R. 299, 305 (Bankr. S.D.N.Y. 2011), *aff'd*, No. 10-B-15973-SCC, 2011 WL 6844533 (S.D.N.Y. Dec. 29, 2011), *aff'd*, 487 F. App'x 663 (2d Cir. 2012) ("Nothing in . . . applicable case law requires a debtor to gamble with the estate's interest at the behest of an out-of-the-money party who has nothing to lose by a roll of the litigation dice."); *In re Soup Kitchen Int'l Inc.*, 506 B.R. 29, 43 (Bankr. E.D.N.Y. 2014) ("[T]he desire of shareholders or guarantors . . . to pursue litigation, from which they have little to lose, in preference to the benefits offered by the Settlement, cannot be given substantial weight."). Despite the Court's earlier suggestion, the Committee has not offered to bear the costs of litigation itself or adopt a contingency plan – thus, the costs of counsel and other fees would fall directly onto the estates. *See* D.I. 351, Transcript of Hearing Held on June 4, 2014, p. 34 ("This strikes me as the kind of case that might even be appropriate, frankly, for a very independent counsel to be prosecuting, if facts are developed, on a contingency basis, as opposed to . . . an hourly rate basis, because of the potential . . . impact upon creditors.") *See, e.g.*, *In re Smart World Techs., LLC*, 423 F.3d 166, 180 (2d Cir. 2005) ("[C]ourts often view favorably the willingness of the party seeking derivative standing to absorb the costs of litigation, since such willingness not only demonstrates a belief in the merits of the claim, but also spares the bankruptcy estate from absorbing any further costs."); *In re STN Enters.*, 779 F.2d at 901.

Likewise, the Debtors and the Court also have the benefit of multiple settlement proposals from Fifth Third, such that the alternative to litigation is relatively known. Fifth Third

-6-

RLF1 10881520v.1

has made offers to substantially increase the carveout under the DIP Order and to allow other claimants to share some litigation proceeds ahead of Fifth Third's DIP Obligations. Settlement on this basis would be patently reasonable for the estates under Federal Rule of Bankruptcy Procedure 9019, and it represents a valuable alternative to litigation – where nothing is guaranteed and Fifth Third's additional costs would erode the value it sees in an amicable resolution.

With these pleading standards and settlement prospects in mind, the Debtors are clearly justified in refusing to sue Fifth Third. A claim-by-claim examination of the Committee's complaint confirms why.

### 1. Declaration that the Proceeds of the Sale to Wal-Mart are Not Subject to Fifth Third's Prepetition Liens Under Code § 552(b).

The Committee's theories on Code § 552(b) are inventive and fail as a matter of law. Even if the Court assumes all alleged facts in the draft complaint are true (while they are neither allegations under Federal Rule of Bankruptcy Procedure 9011, nor are they all true), nothing in the language or legislative history of Code § 552(b), or the case law cited by the Committee, supports an argument that the proceeds of the Wal-Mart sale are not Fifth Third's collateral or that the "equities of the case" exception might apply here.

Two fundamental omissions from the Committee's claims are fatal to its attack under Code § 552(b). First, the Committee does not contest the validity or perfection of Fifth Third's blanket liens on the Debtors' assets as of the petition date.[3] Second, the Committee does not dispute that Fifth Third's prepetition security interest extends to "proceeds." Unlike the secured creditors in the *Residential Capital* decision, Fifth Third *did* have a senior security

---

[3] The Committee's claims regarding irrelevant motor vehicles, fixtures and third-party litigation that were not sold to Wal-Mart are addressed separately below.

interest in all of the Debtors' assets that existed on the filing date and were of the type eventually sold. *See In re Residential Capital, LLC*, 501 B.R. 549, 616-17 (Bankr. S.D.N.Y. 2013). Because of Fifth Third's blanket senior prepetition lien (including a lien on proceeds), there is no concern that proceeds from the sale were attributable to another lender's collateral or funding. The Committee does not allege that equity, loans, or gifts from other parties funded the Wal-Mart sale. Only Fifth Third's loans and its collateral did. *See* DIP Order, generally. Moreover, with merely *four days* between the petition date and execution of the Wal-Mart purchase agreement, and with the Debtors never conducting business postpetition, the Court can and should reasonably conclude that any and all assets sold to Wal-Mart existed on the petition date. The Debtors only maintained their platform until the sale closed. Under one or both of these ways to trace Fifth Third's liens to the Wal-Mart sale, the Court must conclude that what the Debtors sold to Wal-Mart was Fifth Third's prepetition collateral or proceeds thereof.

The Committee tries to align this case with *Residential Capital* by arguing the Wal-Mart sale proceeds are the "direct and exclusive result of the chapter 11 process and the work of the estates' professionals." Motion ¶ 53. This flows from an observation of Judge Glenn that "time, effort, and expense" of the *Residential Capital* debtors likely contributed to the generation of any postpetition goodwill. *Residential Capital*, 501 B.R. at 612. While ultimately dicta in his opinion, Judge Glenn's comment does not persuade here. In *Residential Capital*, other creditors had provided the DIP loans and cash collateral necessary to make such "estate" contributions possible. *Id.* In these cases, Fifth Third and its prepetition collateral sourced all of the Debtors' sale funding.

This omission is problematic for the Committee's "equities of the case" claim as well. Fifth Third is unequivocally not the type of secured creditor that the Third Circuit says

Code § 552(b) is designed to protect against. *See In re Tower Air, Inc.*, 397 F. 3d 191, 205 (3d Cir. 2005) (focusing on prejudicial use of "other assets of the estate"). Since the Debtors did not use any assets other than Fifth Third's collateral and financing to complete the Wal-Mart sale, Fifth Third reaped no benefits from other assets or other parties. Nothing other than Fifth Third's collateral and funding from Fifth Third were used by the Debtors to close the Wal-Mart sale. In this regard, Fifth Third is like the secured lender in *Muma Services,* where Judge Walrath summarily denied a Code § 552(b)(1) request when "it was only through the use of the [lenders'] cash collateral (and the financing provided by [their agent]) that the estate was able to continue to operate and maintain the value of the assets." *In re Muma Servs., Inc.*, 322 B.R. 541, 559 (Bankr. D. Del. 2005). There too the secured creditor was undersecured but with a blanket lien, and the court found no reason to further erode the lender's recovery under Code § 552(b)(1). *Id.*

If the Court also looks to the three *Laurel Hill* factors advanced by the Committee, they cannot carry the Committee's Code § 552(b)(1) claim either. *See In re Laurel Hill Paper Co.*, 393 B.R. 89, 92-93 (Bankr. M.D.N.C. 2008); Motion ¶ 56. First, the Committee complains that Fifth Third's "hostility" to this chapter 11 case has caused a large amount of unpaid administrative expenses, suggesting this represents "estate funds expended on the collateral." Motion ¶¶ 56, 57. It is without question that the estates are suffering from an exorbitant amount of professional fees, but that has nothing to do with the Debtors' sale of Fifth Third's collateral to Wal-Mart. The Committee incurred over half a million dollars in legal fees in 2 months – after the sale of collateral to Wal-Mart and during a period in which Fifth Third did nothing but cooperate with the Committee's discovery requests. That parties incurred fees because Fifth Third was surprised by this chapter 11 filing, did not want be primed by a junior lender, did not want to be baselessly threatened with litigation and labeled a wrongdoer, did not

want to watch an exorbitant amount of unnecessary professional fees be incurred, and does not want to have to fight for a reasonable settlement is unrelated to the *Laurel Hill* factors. The sale agreement was executed four days after the petition date, the sale procedures motion was prepared and entered promptly with Fifth Third's support, Fifth Third paid the success fee for the Debtors' executive who led the sale effort, the sale order was entered with Fifth Third's consent, and Fifth Third funded all of the Debtors' costs (including carveouts for the Debtors' professionals) necessary to complete the sale to Wal-Mart. The sale proceedings in these cases were the easy proceedings, and Fifth Third supported them. The unpaid professionals' fees now weighing on these estates had nothing to do with how Fifth Third's collateral was administered.

Next, the Committee claims Fifth Third's collateral was substantially improved during these cases by the Code itself – not by other assets of the Debtors. Specifically, the Committee cites the prospect of a quick "free and clear" sale and the breathing room of the automatic stay as having inflated the value of Fifth Third's collateral. Motion ¶ 58. In this regard, the Committee's argument becomes almost an academic one. The Committee goes beyond an asset-based analysis and argues for the Court to allocate value to provisions of the Code and the chapter 11 process that cannot be reached by liens. That the Committee makes this argument without a single case cite is telling, because no court has ever done or should do it. The *Residential Capital* court clearly did not, and the Supreme Court has ruled that increase in value of collateral during bankruptcy belongs to the secured creditor. *Dewsnup v. Timm*, 502 U.S. 410, 417 (1992). Making new law in this way would be unnecessarily disruptive to commercial capital markets which expect predictability for treatment of secured claims in bankruptcy, and it would involve making a policy choice properly left to Congress. *See U.S. v. Noland*, 517 U.S. 535, 543 (1996) (policy choice is not a basis for equitable subordination).

Particularly when Fifth Third is not a bad actor and has "paid the freight" for the sale of its collateral to Wal-Mart, the Court should not spend time on this purely theoretical argument of the Committee.

Finally, the Committee replaces discussion of the third *Laurel Hill* factor with general characterizations and speculation about Fifth Third. However, the Court should not ignore this rehabilitation factor, because the legislative history of Code § 552(b)(1) is clear that Congress only meant to give courts discretion to affect security interests on an equitable basis if warranted by the rehabilitative goals of chapter 11. *See In re Laurel Hill*, 393 at 92-93 (examining the legislative history of Code § 552(b)(1) and its "balance"). When rehabilitating a debtor is not achievable, the equitable counterweight to enforcing otherwise valid liens is gone. That is precisely the situation here. As such, the legislative history of Code § 552(b)(1) and the final *Laurel Hill* factor warrant rejection of derivative standing on this claim.

### 2. Claim for Equitable Subordination of Fifth Third's Claims Under Code § 510(c).

Like its alleged Code § 552(b) claims, the Committee's request for standing to seek equitable subordination of Fifth Third's claims is an invitation to stretch the Code beyond its limit. Even if all of the Committee's factual allegations (different from the Committee's speculation and conclusions that run throughout its Motion and draft complaint) are presumed to be true, the Court is without basis to grant relief under Code § 510(c).

When the investigation period ended without more in the Committee's draft complaint, the doors closed on subordination claims against Fifth Third. This is no longer a case where much is unknown about the details of Fifth Third's prepetition conduct; the Committee has unturned all of the stones. Thus, it is now implausible for the Court to find inequitable conduct by Fifth Third because it is undisputed that Fifth Third did not violate any laws, regulations or

-11-
RLF1 10881520v.1

agreements relating to its lending to the Debtors. Fifth Third *always* acted within its rights, and Fifth Third *always* fulfilled its obligations under its contracts and applicable law. The Committee acknowledges as much in stating that Fifth Third "acted within its technical legal right." Motion ¶ 66. Fifth Third made all advances that it was required to make. Fifth Third gave all notices that it was required to give. Fifth Third waited to exercise its rights – after a year of forbearances – until those rights were crystal clear and it saw no better options. The Committee argues that Fifth Third should have continued to allow its position to erode and continue to lend millions of dollars for the benefit other parties, all while Fifth Third had absolutely no obligation to do so. As such, the draft complaint amounts to nothing other than an adversarial and conclusory way to describe some of the final prepetition negotiations between Fifth Third and the Debtors (and their owner).

Equitable subordination is an "unusual remedy which should be applied only in limited circumstances." *See In re SubMicron Sys. Corp.*, 291 B.R. 314, 327 (D. Del. 2003). *See also In re Radnor Holdings Corp.*, 353 B.R. 820 (Bankr. D. Del. 2006); *In re Mid–American Waste Sys., Inc.,* 284 B.R. 53, 70 (Bankr. D. Del. 2002) ("[E]gregious conduct must be established to justify equitable subordination.") (and cases cited therein). Applying equitable subordination here would radically expand its use and subject lawful conduct to improper attack. Other courts of this District, and elsewhere, have rejected attempts to equitably subordinate defendants that acted within the law, and this Court should do the same. *See In re Optim Energy*, slip op.at 18-19. *See also In re Daewoo Motor Am., Inc.*, 471 B.R. 721, 748 (C.D. Cal. 2012) (collecting authorities and explaining that "absent more, however, a simple breach of contract is insufficient to support a claim of equitable subordination."); *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1357 (7th Cir. 1990) ("'Inequitable conduct' in commercial

life means breach *plus* some advantage-taking . . . ."); *In re 604 Columbus Ave. Realty Trust,* 968 F.2d 1332, 1360 (1st Cir. 1992) (affirming finding of equitable subordination where a bank had committed a "substantial" breach of contract and engaged in further "advantage-taking"); *In re CTS Truss, Inc.,* 868 F.2d 146, 148 (5th Cir. 1989) (bank's alleged breach of an oral agreement does "not fall within any of the classic patterns of conduct that have led the courts to fashion the extraordinary remedy of equitable subordination").

### 3. Claim for Surcharge of Fifth Third's Collateral.

Fifth Third is defensive but pragmatic with respect to surcharge, and this makes derivative standing for the Committee unreachable. Fifth Third does not contend that *all* of the Debtors' administrative expenses were unnecessary, or that *none* were incurred to maintain and dispose of Fifth Third's prepetition collateral. How much of the Debtors' expenses were necessary in this regard is debatable, and that any such expenses resulted in a quantifiable benefit to Fifth Third is speculative. But this contrasts with the Committee's blanket assertion that Fifth Third's prepetition collateral should be charged with *all* of the administrative expenses of these estates. Actions to surcharge Fifth Third for the majority of the unpaid administrative expenses would not be colorable – regardless of who brings them. For example, none of the Committee's professional fees and expenses are surchargable, as are none of the Debtors' professional fees and expenses incurred being adverse to Fifth Third. Motion ¶¶ 60-62. These and many other administrative expenses will not fit a surcharge bill, and, therefore, derivative standing to surcharge cannot be granted in the sweeping fashion that the Motion requests.

But even if some part of a surcharge claim is colorable, litigating over it would be unreasonable and the Debtors have rightly chosen not to do so. Fifth Third has already provided large carveouts under the DIP Order, as well as proposed significant carveout increases that would exceed all reasonable estimates of Fifth Third's surcharge exposure. On the other hand,

litigation over surcharge would involve a line-by-line assessment of the Debtors' expenses, along with expert examinations of the supposed benefit to Fifth Third – *i.e.* more discovery that these cases do not need. The costs of litigating to a result would be large. Under these circumstances, the Debtors are justified in electing not to sue a lender that has made serious offers of settlement. Accordingly, derivative standing on surcharge should not be granted to the Committee.

### 4. Claim for Avoidance of Unperfected Liens upon Commercial Tort Claims.

The claim for avoidance of Fifth Third's commercial tort claim liens is misplaced. The Motion argues that Fifth Third does not have *any* lien on certain commercial tort claims – not just an *unperfected* lien. If the Committee is right, then there is nothing to avoid. Should the Court instead treat this as a declaration request, it should take into account that the Committee admits the Brightstar Claims (as defined in the Motion) arise out of a non-compete agreement between the Debtors and their former CEO. Motion ¶ 73. No one doubts that claims arising under or out of a contract are either accounts or general intangibles under the Uniform Commercial Code – *see* UCC §§ 9-102(a)(2) and (42) – and, thereby, collateral on which Fifth Third has an uncontested, valid and perfected lien. Accordingly, only those Brightstar Claims, if any, that are independent of the Debtors' contract rights are potential commercial tort claims. Whether any such tort claims exist is unknown; the claims are merely unresolved litigation for now. Since the Brightstar Claims clearly involve some general intangibles on which Fifth Third has a lien, the value of any related commercial tort claims is unknown, and Fifth Third has offered in settlement a percentage of the Brightstar Claims regardless of the outcome in litigation, the Debtors have again made the right cost-benefit analysis in electing not to sue Fifth Third on this count.

RLF1 10881520v.1

### 5. Claim for Avoidance of Unperfected Liens upon Fixtures.

Relating to fixtures, the Committee alleges that Fifth Third's prepetition liens were unperfected because UCC filings were not made in all of the states in which the Debtors operated. Motion ¶ 79. The fundamental premise of this argument is that assets the Debtors scheduled as "fixtures" are real property, not personal property (*i.e.*, "goods" or "equipment" as defined in the UCC). It is undisputed that any assets of the Debtors constituting "goods" or "equipment" are subject to Fifth Third's valid and properly perfected liens. The period to challenge such liens has passed without objection. Fifth Third believes that none of the Debtors' assets, and particularly none that have been liquidated postpetition, were "fixtures" in the realty sense. All of the Debtors' locations were leased, their assets were moveable, and they were not in the practice of permanently attaching assets to those premises. This is why the Debtors are right not to sue Fifth Third on this issue. Not only is the outcome speculative, but the value of the amounts at issue are likely small or zero. Accordingly, derivative standing for the Committee is defective on this claim because likely none of the Debtors' "fixtures" are real property interests covered by the UCC, and the Debtors have made the prudent cost-benefit decision on this small issue.

### 6. Declaration that Motor Vehicles Are Not Fifth Third's Collateral.

Fifth Third does not assert that motor vehicles are among its prepetition collateral. If a 2006 Chevy Suburban was still owned by the Debtors on the petition date, it would have only become postpetition collateral under the DIP Obligations. Accordingly, there is no dispute between Fifth Third and the Committee over motor vehicles, and the Motion is unnecessary in this regard.

7. **Declaration that Fifth Third Is Not Entitled to Interest, Fees, Charges and Expenses Under Code § 506(b).**

The Committee misreads Fifth Third's proof of claim on the issue of accrued and accruing interest, fees, charges, and expenses, but that does matter. Fifth Third does not seek allowance of any amounts under Code § 506(b), and the Motion is unnecessary on this point.

C. **Exclusive Standing for the Committee Would Improperly Replace a Fiduciary with Conflicted Parties.**

In no event should derivative standing for a committee be exclusive. That type of standing would make a committee an examiner with a right to sue – without meeting the disinterestedness requirements of Code § 1104. Creditors and committees are simply unfit to be fiduciaries of these estates; they are by definition not disinterested. With this in mind, it makes complete sense why courts do not strip chapter 11 debtors of their fiduciary capacities outside the terms of Code §§ 1104 and 1112, for example. Other courts of this District have recently resolved this exclusivity issue, and nothing should be different here. *See In re Centaur*, 2010 WL 4624910 at *2 ("While granting the Committee standing includes authority to settle the Claims, subject to Court approval, that authority is not exclusive. A grant of derivative standing does not strip a debtor of ownership of the Claims and, accordingly, the Debtors continue to have the right, subject to Court approval, to settle the Claims."); *see also In re Dewey & LeBoeuf LLP*, No. 12-12321 (MG), 2012 WL 5985445 at *7 (Bankr. S.D.N.Y. Nov. 29, 2012) ("[A] debtor has the authority to settle claims on behalf of its estate within a chapter 11 plan, even if derivative standing has been granted to a creditors' committee to prosecute such claims."). The Debtors, so long as they are in chapter 11, should always be free to continue settlement negotiations with Fifth Third. *See* Exhibit A, Determination Notice; D.I. 447, Objection of Fifth Third Bank to Mot. of the Official Committee of Unsecured Creditors for Entry of an Order Pursuant to Fed. R.

Bankr. P. 9006(c) and L. Bankr. R. 9006-1(e) Shortening Notice with Respect to the Committee's Standing Mot. ¶ 4.

        **D.    Applying the Third *Cybergenics* Factor, the Motion Should Be Mooted or Denied, but, if It Is Granted to Any Extent, Reimbursement of the Committee's Fees and Expenses Should Be Limited to Recoveries by Unsecured Creditors Other Than Fifth Third or Adeptio.**

Court approval for derivative actions invokes the independence and power of the Court to police the parties and advance resolution of the case under the circumstances. *Cybergenics*, 330 F.3d at 576. Since the Court's denial of Fifth Third's first motion to convert, Fifth Third has worked hard and at great cost to meet the concerns it heard from the Court. It cooperated with the Committee's discovery, it negotiated at length with the Debtors, Adeptio, and, most recently, the Committee, and it waited four more months until amicable resolution looks as bleak as it does now to renew its conversion motion. Second Conversion Motion ¶¶ 1, 6, 8. Fifth Third came through that crucible fully intact, and it is not the litigation target or obstructionist the Court may have been concerned it was. Even if the Committee's claims did not need to be colorable or justifiably refused, *Cybergenics* arms this Court with authority to do what now seems right in regards to Fifth Third. *See In re Ira Haupt & Co.*, 361 F.2d 164, 168 (2d Cir. 1966) ("The conduct of bankruptcy proceedings not only should be right but must seem right.").

This means the Court should convert these cases (*i.e.*, moot the Motion), deny the Motion for all the reasons discussed above, or – if the Court must permit the Committee to proceed on any basis – restrict the Committee's and its counsel's rights to reimbursement to amounts so recovered for the Debtors' WARN and trade creditors. Code § 503(b)(3) is the principal statute on which the Third Circuit relied in *Cybergenics*. *Cybergenics*, 330 F.3d at 563-66. It provides for allowance of an administrative expense claim for the actual, necessary

expenses, incurred by a creditor that "recovers, after the court's approval, for the benefit of the estate any property transferred or concealed by the debtor," as well as "reasonable compensation" for certain professionals of such a claimant. *See* 11 U.S.C. §§ 503(b)(3)(B) and 503(b)(4). The Third Circuit discussed how these Code provisions may supersede Code § 330 when derivative standing involves a committee, but it has not determined the issue. *Cybergenics*, 330 F.3d at 565 n.6. However, at least one other court in this District has tackled it. Faced with more plausible claims than the Committee alleges here, Judge Carey concluded that "without an adequate basis for quantifying, with any reasonable certainty (even within a range), potential benefit to the estate . . . . I will grant the Committee's request for standing to prosecute the Claims, but will limit recovery of the Committee's professional fees incurred in pursuing the Claims to any cash proceeds or other quantifiable value received by the estate as a result of the litigation." *In re Centaur*, 2010 WL 4624910 at *7. This ruling forced the committee to have a clear downside, rather than keeping available the prospect of reimbursement under Code § 330. The Committee has already included the costs of investigation and drafting of its complaint in its fee applications; it will surely do the same if it is allowed to sue. This objection provides several reasons why the Court should reject all derivative standing, but the last prong of *Cybergenics* and Code § 503(b) should be used to align the incentives (or disincentives) of the Committee if it is allowed to bring any of its alleged claims against Fifth Third.

**RESERVATION OF RIGHTS**

In addition to the foregoing, Fifth Third demands strict proof from the parties of the appropriateness of the relief requested by the Motion. In this regard, Fifth Third may promptly issue discovery in respect of its allegations and any witnesses or exhibits to be used at trial on the Motion. If such discovery is not promptly met with responses, Fifth Third hereby

-18-
RLF1 10881520v.1

requests (in addition to such other motions it may file) that the Court either order compliance with such discovery or adjourn the Motion, as may be necessary, until responses are received.

## CONCLUSION

The Motion is a transparent attempt by the Committee to threaten Fifth Third into offering more in compromise than it already has. This will not work as a negotiation strategy, and it does not work as a basis for derivative standing. *Cybergenics* requires colorable claims be unjustifiably refused by the Debtors. Here, the Committee's proposed claims are hardly colorable and the Debtors' decision not to sue is completely sound. Fifth Third has put several reasonable settlement options on the table for the other parties. The Debtors want to continue entertaining them, but not at the expense of incurring more litigation costs. The Committee would rather play the "litigation lottery" with Fifth Third. The Court should not condone the

Committee's game, particularly when four months of discovery have confirmed what may not have been evident to the Court at the first conversion motion hearing: Fifth Third was not and is not a wrong-doer. These cases need to move on, and granting the Motion would not allow that.

Dated: September 29, 2014
Wilmington, Delaware

/s/ *Zachary I. Shapiro*
Paul N. Heath (No. 3704)
Zachary I. Shapiro (No. 5103)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701
Email: heath@rlf.com
shapiro@rlf.com

- and -

Ronald Barliant
Randall L. Klein
Jeremy M. Downs
Prisca M. Kim
GOLDBERG KOHN LTD.
55 East Monroe Street, Suite 3300
Chicago, Illinois 60603-5792
Telephone: (312) 201 4000
Facsimile: (312) 332 2196
Email: Ronald.barliant@goldbergkohn.com
randall.klein@goldbergkohn.com
jeremy.downs@goldbergkohn.com
prisca.kim@goldbergkohn.com

*Attorneys for Fifth Third Bank*